

## NUMBER 13-14-00318-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

---

### IN THE INTEREST OF T.W., A CHILD

---

**On appeal from the County Court at Law
of Aransas County, Texas.**

---

## MEMORANDUM OPINION

### Before Justices Benavides, Perkes, and Longoria
### Memorandum Opinion by Justice Longoria

By five issues, appellant, B.W., challenges the legal and factual sufficiency of the evidence supporting a final order terminating her parental rights over her minor son, T.W.[1] *See* TEX. FAM. CODE ANN. §§ 161.001(1)(D), (E), (O), (P), 161.001(2) (West, Westlaw through 2013 3d C.S.). We affirm.

---

[1] We refer to appellant and her children by their initials to protect their privacy. *See* TEX. R. APP. P. 9.8(b) (providing that in a case where the termination of parental rights are at issue, the court of appeals shall use an alias to identify a minor and, if necessary to protect the minor's identity, the minor's parents or other family members).

## I. BACKGROUND

On April 18, 2013, the Texas Department of Family and Protective Services (the Department) received an intake report regarding a police drug raid at a house in Aransas Pass, Texas. The raid did not disclose any narcotics, but police found "drug paraphernalia."[2] The intake report described the house as "uninhabitable," with inoperable plumbing and holes in the walls exposing studs and wires. Appellant had recently moved into the house with her boyfriend. At the time of the raid, T.W., appellant's two-year-old son, was still living with his father, C.S., but moved into the house with appellant a few days later. The report further alleged that H.T., appellant's nine-year-old daughter, was not present during the raid because H.T.'s paternal grandparents were preventing her from seeing appellant. H.T.'s relatives acted after H.T. observed C.S. "choking" appellant and jumped onto C.S.'s back "because she thought he was going to kill her mom."

Eric Duncan, the Department investigator initially assigned to the case, interviewed H.T. at her school. H.T. told Duncan that she witnessed multiple physical altercations between appellant and C.S. during the time when she and appellant were living with him. She described how C.S. would "choke" her mother unless he was physically restrained. However, H.T. did not tell Duncan that she witnessed any drug use by C.S.

Duncan made several attempts to locate appellant and eventually contacted appellant at her mother's house in Rockport, Texas. During the interview, appellant told him that she moved there with T.W. because the electricity had been cut off at the Aransas

---

[2] The "drug paraphernalia" were "cookers," bags consistent with packaging narcotics, a digital scale, and a spoon with "burn marks" and with a "powdery substance" in the concave section of it. The record does not indicate that the substance was tested.

Pass house. Appellant admitted to using heroin two weeks prior to the Department's involvement, using methadone immediately prior to that, and also recently using methamphetamines. Appellant also confirmed that she was injured by C.S. in multiple incidents of domestic violence.

The Department requested that appellant find temporary placements for her children. Appellant agreed to let H.T. remain in the custody of H.T.'s paternal relatives, and T.W. was temporarily placed with C.M., a friend of C.S.'s family. Duncan told both appellant and C.S. that they must submit to a drug screening, but neither appeared at the initial appointment for the screening. Several weeks later, the Department managed to contact appellant again. Appellant took a hair follicle test which returned positive for methamphetamines. Neither appellant nor C.S. cooperated with Duncan's attempts to get them to participate in a "Family Team Meeting" to discuss the steps necessary to regain custody of T.W.[3]

On May 11, 2013, C.M. informed Duncan that she was no longer able to care for T.W. The Department asked appellant and C.S. to suggest an alternative placement option, but appellant and C.S. were unable to suggest another person to care for T.W. for longer than the weekend. T.W. was placed in foster care and the Department filed a petition seeking temporary managing conservatorship over T.W.[4] The Department later petitioned the trial court to permanently terminate the parental rights of appellant and C.S.

---

[3] We take the foregoing uncontested facts from Duncan's affidavit attached to the Department's original petition for temporary managing conservatorship. Duncan was no longer employed by the Department at the time of the termination hearing in this case, but the affidavit was before the trial court and is in the appellate record. Stephanie Diaz, Duncan's supervisor and the custodian of the records in this case, testified to its contents without objection.

[4] T.W. did not return to appellant's care between the time C.M. informed the Department that she could no longer care for him and the Department's decision to seek temporary managing conservatorship.

3

over T.W.[5]  The Department filed a separate case for H.T., who is not a party to this appeal.

Cynthia Vera, the Department caseworker assigned to the case at the adversary hearing, testified for the State.  Vera testified that at the initial adversary hearing, the trial court ordered appellant to work with the Department to develop a Family Service Plan setting out the steps necessary for her to regain custody of T.W.  However, appellant did not appear at the scheduled meeting to develop the plan, and the Department was unable to contact her.  The Department nevertheless developed a family service plan for appellant.

At a status hearing held on July 9, 2013, appellant signed the plan, and the court made the plan an order of the court.  The plan required appellant to:  (1) attend counseling at the Women's Shelter of South Texas for victims of domestic violence; (2) attend individual counseling and a psychosocial assessment with a therapist named Ronald Morgan; (3) complete a drug assessment and substance abuse counseling with Gulf Coast Rehabilitative Services; (4) submit to random drug testing; (5) maintain contact with the Department and complete the requirements in the family service plan; (6) notify the caseworker of any changes in her contact information or address within 72 hours; (7) participate in supervised visitation with T.W. and complete parenting classes; (8) obtain employment with income sufficient to provide for T.W.'s basic needs; (9) obtain safe and sanitary housing with working utilities; and (10) pay $50.00 in child support per month, among other requirements.

---

[5] Diaz testified that the Department had "minimal contact" with C.S. during the entire course of the case.  C.S. did not file a pleading or appear at any hearing in this case except for the initial adversary hearing.

Vera testified that she and appellant "went step by step over the services that [appellant] was supposed to comply with," but that appellant completed only the drug assessment and counseling. Appellant began the drug and alcohol assessment and substance abuse counseling on August 8, 2013 and completed them on March 3, 2014. In October of 2013, appellant tested positive for methamphetamines, opiates, amphetamines, and hydrocodone. A urine test on March 23, 2014 tested positive for methamphetamines, amphetamines, and morphine. Later, a hair follicle test returned positive for amphetamines and methamphetamines.

Vera further testified that during the course of the case Vera had to "search for [appellant] numerous times," and that appellant did not maintain contact with the Department except to inform Vera whether she would be present for a visitation with T.W. Vera testified that appellant would frequently give Vera a contact address and then move without informing Vera or anyone else in the Department. Vera told the court that, during this period, appellant maintained a single residence for no longer than "maybe a month or so." However, appellant regularly attended visitations with T.W., except for one just prior to trial because she had been hospitalized following a suicide attempt. Vera testified that she spoke with appellant immediately prior to the termination hearing and that appellant told her that she had successfully completed parenting classes and was set to start a new job. However, Vera did not have a certificate of completion from the parenting classes, and appellant did not inform her of the name of her employer or any details of the new job. Vera also testified that appellant had not obtained employment during the course of the service plan but had been irregularly "doing odd jobs to get money." Appellant did not pay any child support except that which was automatically withheld from

5

her income tax return. Vera testified that, in sum, in her opinion appellant was unable to provide a safe and stable environment for T.W.

Appellant testified on her own behalf. Appellant told the court that she had been diagnosed with depression and bipolar disorder and had not been medicated during the entire course of the case. She recently had participated in an initial interview with the MHMR program, but she testified on cross-examination that she delayed using that service until just before trial because she "was strung out on drugs." Appellant testified that she also unsuccessfully attempted to get admitted to Charlie's Place, a substance-abuse treatment center. Appellant attributed her lack of success in finding employment to her lack of reliable access to transportation and to her drug use. She attributed her difficulty in keeping a single residence to personality conflicts with people at the various residences. Appellant testified that she loved T.W. and believed that she could provide a stable home for him if the trial court gave her a six-month extension.

The trial court rendered a judgment finding that the Department had shown by clear and convincing evidence the existence of four of the statutory grounds for termination and that termination of appellant's parental rights was in T.W.'s best interests. *See* TEX. FAM. CODE ANN. §§ 161.001(1)(D), (E), (O), (P), 161.001(2). The trial court also rendered judgment terminating C.S.'s parental rights over T.W. Only appellant perfected an appeal.

## II. STANDARD OF REVIEW

"The natural right which exists between parents and their children is one of constitutional dimensions." *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994). Parents have a "fundamental right to make decisions concerning 'the care, custody, and control

6

of their children.'"  *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014) (per curiam) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).  Because of the importance of the constitutional interests at issue, we strictly scrutinize termination proceedings and construe all applicable statutes in favor of the parent.  *T.W. v. Tex. Dep't of Family & Protective Servs.*, 431 S.W.3d 645, 649 (Tex. App.—El Paso 2014, no pet.); *In re M.C.*, 352 S.W.3d 563, 565 (Tex. App.—Dallas 2011, no pet.).

A court may order the parent-child relationship terminated on a finding:  (1) that the parent engaged in certain conduct specified in section 161.001(1) of the family code, and (2) that termination is in the best interests of the child.  *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (holding that termination may not be based solely on the trier of fact's determination of the child's best interests).  The State has the burden to prove both elements by clear and convincing evidence.  *In re A.B.*, 437 S.W.3d at 502.  The family code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2013 3d C.S.).  This is an intermediate standard that falls between the preponderance of the evidence standard applicable in most civil proceedings and the reasonable doubt standard of criminal proceedings.  *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.).

Under this standard, in both a legal and a factual sufficiency review appellate courts ask whether there is sufficient evidence "that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden

of proof." *In re S.Y.*, 435 S.W.3d 923, 927 (Tex. App.—Dallas 2014, no pet.). However, we approach the body of evidence differently in both reviews. In a legal sufficiency review:

> To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.
>
> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence.

*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (internal citations omitted). In a factual sufficiency review, we must determine:

> whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*Id.* at 266–67 (citing *In re C.H.*, 89 S.W.3d at 25). The Texas Supreme Court has cautioned that our factual sufficiency review must not be so rigorous that the only fact findings which could survive review are those established beyond a reasonable doubt. *In re C.H.*, 89 S.W.3d at 26.

8

## III. STATUTORY GROUNDS

By her fourth issue, appellant argues that there is insufficient evidence to show that T.W. was "removed because of abuse or neglect." *See* TEX. FAM. CODE ANN. § 161.001(1)(O). Appellant does not contest that she did not complete the family service plan or that T.W. had been removed from her care for more than nine months at the time of the termination hearing.

### A. Applicable Law

Section 161.001(1)(O) of the Texas Family Code provides that a court may terminate the parent-child relationship if the parent:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

*Id.* We interpret the terms "abuse" and "neglect" broadly to include risks or threats presented by the child's environment. *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). Part of that analysis necessarily includes the harm suffered or the risk of harm encountered by other children under the care of the parent, even before the child's birth. *Id.*; *see In re K.N.D.*, 424 S.W.3d 8, 9 (Tex. 2014) (per curiam) (holding that there was legally sufficient evidence that a newborn was removed for abuse or neglect where the mother had been injured in an episode of domestic violence a short time before giving birth to the child, and had recently relinquished her parental rights over an older child for negligent supervision and medical neglect). Evidence of abuse or neglect submitted in an affidavit attached to a petition for removal, combined with unchallenged trial court findings that removal of the child from the parent's care was necessary because of a

9

"substantial risk of a continuing danger" if the child returned home, are sufficient to establish that a child was removed from the parent's custody under chapter 262 for abuse or neglect. *See In re E.C.R.*, 402 S.W.3d at 248–49.

## B. Discussion

We conclude that there is sufficient evidence that T.W. was removed from appellant's care for abuse or neglect under chapter 262 of the family code. The Department attached an affidavit to its original petition alleging that H.T. frequently witnessed C.S. "choke" appellant, H.T. jumped on C.S.'s back during one of those fights to try to pull him off her mother, and that appellant confirmed both this altercation and that she had been injured by C.S. H.T.'s paternal relatives removed H.T. from appellant's care because of the violence and because H.T. was frequently absent from school.[6] The affidavit further cited the police raid, the "uninhabitable" condition of the house where T.W. began living a few days after the raid, and an occasion when H.T.'s grandfather observed a syringe with an undetermined substance on a table in the same room as H.T. and T.W. The affidavit also described appellant's admissions to recently using heroin and methamphetamines. Appellant did not contest any of these facts before the trial court. The trial court specifically found that there was "a continuing danger to the physical health or safety of [T.W.] if [T.W.] is returned to" appellant's care, findings that are also unchallenged by appellant. *See id.* Based on all of the foregoing, we conclude that the evidence is both legally and factually sufficient to support the trial court's finding that T.W. was removed for abuse or neglect under chapter 262 of the family code. *See In re E.C.R.*, 402 S.W.3d at 248–49; *In re K.N.D.*, 424 S.W.3d at 9; *see also In re K.L.C.*, No. 11-14-

---

[6] According to Duncan's affidavit, H.T. informed him that no one in the house was willing to take her to school.

00019-CV, 2014 WL 3639124, at *3 (Tex. App.—Eastland July 17, 2014, pet. denied) (mem. op.) (concluding that a child was removed for the mother's care for abuse or neglect under chapter 262 because of the conditions of the home and the mother's drug use).

We overrule appellant's fourth issue. Because the Department only needs to prove one of the statutory grounds for termination, we will not address appellant's second, third, and fifth issues in which she challenges the trial court's findings under subsections 161.001(1)(D), (E), and (P). *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (P); *In re C.H.*, 89 S.W.3d at 23; *see also* TEX. R. APP. P. 47.1.

## IV. BEST INTERESTS

By her first issue, appellant argues that the Department failed to establish by clear and convincing evidence that terminating her parental rights was in T.W.'s best interests.

### A. Standard of Review and Applicable Law

In addition to a statutory act or omission, the Department must show by clear and convincing evidence that termination is in the best interests of the child. TEX. FAM. CODE ANN. § 161.001(2). The Department must rebut the strong presumption that the child's best interests are served by maintaining the parent-child relationship. *In re C.M.C.*, 273 S.W.3d 862, 876 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (op. on reh'g). We consider a list of non-exclusive factors articulated by the Texas Supreme Court to guide courts in conducting this analysis:

> (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed

11

placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). However, determining the best interests of the child does not require proof of any unique set of factors or limit proof to any specific set of factors. *T.W.*, 431 S.W.3d at 652; *see M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) (observing that undisputed evidence of just one *Holley* factor may be sufficient to support a finding that termination is in the best interests of the child). The same evidence used to establish grounds for termination under section 161.001(1) may also be probative of determining whether termination is in the best interests of the child. *In re C.H.*, 89 S.W.3d at 28; *T.W.*, 431 S.W.3d at 652.

### B. Analysis

Appellant argues that there is no evidence of any of the *Holley* factors and that "[t]he one thing that is certain [*sic*] in with [appellant] is that she loves and cares for her child, as is evident in her visitations with him. She maintained her visits, even though she might have fallen short in other areas." After a thorough review of the record, we conclude that there is both legally and factually sufficient evidence to support the trial court's firm belief or conviction that termination was in the best interests of T.W.

Regarding the desires of the child, appellant argues that "[t]here was no evidence that the child did not want to return to his mother." However, T.W. was only three years-old at the time of trial, and there is no evidence he was able to articulate his preferences. This factor is neutral in the best interests analysis. *See In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied).

12

Regarding appellant's ability to provide a stable home for T.W. and provide for his emotional and physical needs, it is uncontested that appellant did not obtain employment during the course of the case as required by the family service plan adopted by the trial court. Appellant apparently told Vera that she was set to start a new job on the day of the termination hearing, but provided no specifics. Appellant was also unable to maintain a single residence for more than a month and, at one point, she lived with T.W. in a house described as "uninhabitable." At the time of the termination hearing, appellant had stayed a few days with a relative but still had no permanent residence. Furthermore, she exposed both of her children to domestic violence between her and C.S. and, during one incident, H.T. became involved when she tried to stop C.S. from choking appellant. *See Id.* at 82–83 (holding that evidence of appellant's history of exposing her children to domestic violence and of unstable housing, employment, and relationships weighed in favor of termination); *In re T.N.*, 180 S.W.3d 376, 384 (Tex. App.—Amarillo 2005, no pet.) ("A parent's unstable lifestyle, lack of income, and lack of a home may also be considered in a determination of a parent's ability to provide for a child's emotional and physical needs"). At the time of the trial appellant was no longer living with C.S., but we cannot ignore appellant's history of drug use, unstable relationships, inability to maintain a stable residence, and exposure of her children to domestic violence. *See In re I.G.*, 383 S.W.3d 763, 772 (Tex. App.—Amarillo 2012, no pet.) ("Past is often prologue."); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *6 (Tex. App.—Corpus Christi Feb. 1, 2007, no pet.) (mem. op.) (holding that the jury could have inferred that the mother's past inability to care for her children, as established by her history of unstable housing,

employment, and relationships, was "indicative of the quality of care appellant is capable of providing in the future"). This factor weighs in favor of termination.

Regarding the programs available to assist appellant, appellant did not make use of most of the programs that were available to her. *See A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 715 (Tex. App.—El Paso 2012, no pet.) (holding that the fact the parent recognized that he had a problem with anger but did not take advantage of available programs weighed in favor of termination). Appellant did not complete therapy or domestic violence classes and only had an initial interview with the MHMR program just before the termination hearing. Appellant freely admitted at trial that she did not start to make use of the MHMR program earlier because she was "strung out on drugs." *See id.* Appellant did complete a drug assessment and substance-abuse counseling, but it took her eight months instead of the usual three. Appellant tested positive for methamphetamines, opiates, amphetamines, hydrocodone, and morphine at various times both during and after she completed the program. A parent's pattern of drug use, especially after completing a substance abuse program, can weigh in favor of termination. *See In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 688 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ("The evidence shows the programs appellant attended were insufficient to help her . . . stay off drugs."). This factor weighs in favor of termination.

More generally, the unchallenged findings that appellant did not comply with the requirements in the family service plan also weigh in favor of termination. *See In re E.C.R.*, 402 S.W.3d at 249 (holding that findings under section 161.001(1)(O) can also

14

be probative in the best interests analysis); *In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. filed) (same). Appellant did not maintain contact with the Department or inform them of the changes in her address, even though she was able to timely notify the Department that she would be present for scheduled visitations with T.W. Appellant also continued to use illegal drugs after agreeing in the family service plan to avoid that activity. *See Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 102 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that parent's continued use of illegal drugs once the parent was aware that her parental rights were in jeopardy can support finding that termination is in the best interests of the child).

Regarding the future plans for T.W. of the parties seeking custody, appellant was asked about her future plans for T.W. during the termination hearing, but responded by requesting to stop testifying. She resumed testifying after a break, but did not mention any plans for T.W.[7] Diaz testified that the Department could place T.W. with certain distant relatives of C.S. Those relatives expressed a desire to adopt T.W., had a successful visit with him, and completed a favorable home study. This factor weighs in favor of termination. *See H.N. v. Tex. Dep't of Family & Protective Servs.*, 397 S.W.3d 802, 814–15 (Tex. App.—El Paso 2013, no pet.).

In sum, considering appellant's pattern of drug use, her inability during the course of the case to maintain a constant residence, obtain employment as ordered by the trial court, or complete the other requirements of the family service plan, and given the exposure of her children to domestic violence, we conclude that the evidence is legally

---

[7] Appellant's trial counsel told the court that appellant has great difficulty speaking in front of groups and asked appellant several times to confirm that she was not under the influence of drugs during the hearing. Appellant denied that she was under the influence of drugs but told the court that she was disturbed because her mother had been diagnosed with terminal cancer the day before the hearing.

and factually sufficient to support the factfinder's firm belief or conviction that termination is in the best interests of T.W.  *See In re S.Y.*, 435 S.W.3d at 927.  We overrule appellant's first issue.

### V. CONCLUSION

We affirm the judgment of the trial court.


NORA L. LONGORIA
Justice

Delivered and filed the
3rd day of December, 2014.